

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00280-CR

_____

ANDREW MICHAEL WILSON, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 271st District Court
Jack County, Texas
Trial Court No. 4720

Before Sudderth, C.J.; Meier and Kerr, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

In five issues, Appellant Andrew Michael Wilson appeals his conviction for aggravated sexual assault of his minor daughter, Amy.[1] *See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i) (West Supp. 2018). We affirm.

**Background**

**I. Amy's outcry**

Wilson married Katherine, Amy's stepmother,[2] in 2006, when Amy was about four years old. In June or July of 2012, Wilson, Katherine, and Amy moved into a house in Jacksboro. By February 2015, Wilson and Katherine moved away to Springtown and left Amy, then 12 years old, living with Katherine's parents, Judith and Kevin. According to Judith, Amy stayed in Jacksboro because Amy wanted to finish her sixth-grade year in Jacksboro. But Amy testified at trial that she had wanted to continue living with Judith because Wilson did drugs and fought with Katherine a lot. She did not know what kind of drugs Wilson used, but she testified that he called it "dope" and that whenever he "got off [the dope], he was mean."

Shortly after they moved to Springtown, Wilson and Katherine were incarcerated.

---

[1]We refer to the complainant, family members, and other witnesses by aliases to protect their privacy. *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[2]Amy did not have a relationship with her biological mother.

Wilson did not have any contact with Amy from February to June 2015.

Judith testified at trial that around noon on June 1, 2015, she discovered a handwritten note that Amy had left on Judith's bedside table. The note was written on notebook paper and folded so that the front said:

To: Nana[3]

From: [Amy]

What I'm about to tell u is the truth and I am not lying about it.

On the other side of the paper, the note said:

Dear Nana,

You know how [y'all] were talking about how your dads molest[ed] [y'all][4] well my dad raped me on my birthday last year I tried to scream but he covered my mouth I tried to fight him but I couldn't so I went to the bathroom after it was all done and I was bleeding really bad so I lost my virginity to my dad I didn't know how to tell u but I was afraid to tell anybody because I thought he was going to hurt me so I told you because I trust you I should've spoke earlier but I thought no one would've believed me.

So please trust me it happened to me

Love, [Amy]

---

[3]Judith testified that Amy called her "Nana."

[4]Judith testified that the night before, she and a friend had been talking about how their fathers had molested them as children but they were unaware that Amy was listening to the conversation. Judith testified that Katherine was a result of Judith's father's molestation.

There were also drawings on the note of a star, a butterfly, a flower, a heart, a crying face, and "I [heart] U NANA."

Judith testified that she was surprised by the letter and that she spoke to Amy about how serious such an accusation was. Judith then called Amy's Child Protective Services (CPS) caseworker,[5] who instructed Judith to take Amy to the police station. Judith did so immediately. She subsequently took Amy to Virginia's House in Graham for a forensic interview and to Cook Children's Hospital for a sexual assault examination. An investigation ensued and at some point while it was pending, Judith adopted Amy and Wilson's parental rights were terminated.

## II. The trial

In addition to Judith's testimony and the written outcry letter, the following evidence was admitted at trial.

### A. Amy's testimony

Amy, who was fourteen by the time of trial, testified that she wrote the handwritten note that Judith found on her bedside table in June 2015. When asked why she wrote the note, Amy testified, "Because my dad raped me."

Amy then described the abuse for the jury. She recounted how Wilson forced her to have sex in his bedroom in their Jacksboro home on her birthday. She testified that Katherine was asleep in another bedroom in the house when Wilson came to her

---

[5]According to Judith, CPS has been involved in Amy's life since she was born.

room during the night, woke her up, and said that he had a birthday present for her and told her to go to his room. She recalled that Wilson took off her pajamas and underwear, took off his own clothes, made her lie down on the bed, and had sex with her. She remembered that Wilson was breathing hard, that she was crying, that she tried to get up but could not, and that she tried to scream but Wilson covered her mouth. Amy testified that when Wilson was finished, she went to the bathroom and realized that she was bleeding and in pain. She testified that she did not tell anyone about the incident because she was scared of Wilson because he was abusive to Katherine. She testified that she finally told Judith in June 2015 because she felt safe because Wilson was in jail.

### B. Sexual assault examination

Stacey Henley, a sexual assault nurse examiner (SANE), testified to her July 2015 examination of Amy. Henley testified that Amy described the abuse: "My dad raped me when I was 10. His thing went inside me. He had been doing dope." Amy clarified that Wilson's "thing" was his penis. According to Henley, Amy said that Wilson used a gel and that afterward she had pain and bleeding.

Henley testified that they seemed to be "struggling with the date a little bit" because Henley had written down 2013 initially but later changed it to 2012. But Henley noted that Amy "was clear that it was on her birthday." When asked, "[B]ased on your experience conducting sexual assault exams, is that difficult for a 12-year-old child to be able to ascertain the exact year?" Henley replied, "It is probably the most

5

difficult thing that we deal with. They usually . . . can articulate where it happened and what happened, but the when is often difficult." On cross-examination, Henley admitted that Amy was certain she was ten years old when it happened.

During her physical examination of Amy, Henley observed decreased tissue of her hymen. Henley identified this as a nonspecific finding that was consistent with Amy's description of the abuse but could also simply be a normal variant.

### C. Wilson's abuse of Beth

Beth testified to Wilson's sexual abuse of her when she was ten or eleven years old, when he was in his late 20s. Beth knew Wilson as a family friend of her parents; he lived in the same trailer park as she did with her parents. Beth testified that her parents often worked late at night, that Wilson would come over to watch her and her two siblings, and that she would go to his trailer often. According to Beth, Wilson provided her with marijuana and alcohol when she was eleven years old.

Beth testified that at the end of 2006, Wilson forced her to have sex with him on a camping trip to Nocona Lake. Beth described how Wilson took her, her two siblings, and Amy to the lake in a green car. Everyone else was sleeping in a tent, but Beth elected to sleep in the backseat of the car because she was afraid of bugs. She remembered that Wilson was drinking Bud Light beer that night and that Wilson told Beth to stay awake in the car so that he could talk to her. Once Wilson joined her in the car, he got into the backseat with her and had sex with her. Beth remembered, "He told me not to say a word or he'll kill me or whatever guy that I get with."

6

Beth testified that this wasn't the only incident of sexual abuse by Wilson. Beth testified that it happened twice in the trailer she lived in, in an abandoned Wichita Falls house a few days after her eleventh birthday, and then "at the lake . . . a few more times." She recalled that she had a blue sleeping bag she took to the lake but that she threw it away before they left the lake "[b]ecause it was dirty with white stuff" after he ejaculated on it. At one point, Beth thought she might be pregnant and told her older sister about the abuse. She also told her dad, Hank, and Hank confronted Wilson. According to Beth, Hank asked Wilson if he was having sex with Beth and Wilson replied, "[Y]es, I was going to talk to you about it."

Hank also testified to his confrontation of Wilson. Hank testified that in July 2006 he confronted Wilson after hearing rumors around the trailer park that Beth, then eleven, was pregnant. Hank testified that he asked Wilson if it was true and Wilson said, "I was going to talk to you about that. . . . [s]he might be." When Hank said, "[O]kay, then by whom?" Wilson said, "[B]y me." Hank testified that he called the police immediately.

Detective Raymond Perry of the Wichita Falls Police Department investigated Beth's claim of sexual abuse by Wilson. Detective Perry testified that Beth gave some "bizarre" details in her forensic interview, and as a result, Detective Perry collected a sheet and a blanket from her bed at her trailer home. The bedding was tested for the presence of semen but none was detected. He also recalled driving with Beth and her mother to try to find the abandoned house in which Beth claimed Wilson assaulted

7

her and that Beth pointed out a specific house and made statements that she was "totally sure" that was where it happened, on a bed in a particular room. Detective Perry described going back to the house without Beth or her mother and contacting the homeowner, who reportedly told Detective Perry that the house had been vacant for two years and there had never been a bed or any furniture in the home. This led Detective Perry to rule out that location.

Detective Perry also recalled meeting with Beth's brother and her brother's showing him another location, but Detective Perry again contacted the homeowner who said that there had been no furniture in the home for a year and a half.

Detective Perry concluded that Beth was not being truthful and did not pursue charges against Wilson because he could not find any corroborating evidence.

**D. Verdict**

The jury found Wilson guilty of aggravated sexual assault and assessed a sentence of ten years' confinement. The trial court sentenced Wilson accordingly and this appeal followed.

**Discussion**

Wilson brings five issues on appeal in which he argues: (1) that the trial court abused its discretion by denying his request for a continuance, (2) that the trial court abused its discretion by admitting Beth's and Hank's testimony to extraneous offenses, (3) that the trial court erroneously restricted his questioning of the venire panel, (4) that the trial court erred by admitting Amy's letter to Judith as an outcry

8

statement, and (5) that the trial court reversibly erred by delivering the *Allen* charge. We will address each in turn.

## I. Motion for a continuance

Wilson's first issue argues that the trial court abused its discretion by denying his request for a continuance to allow more time for a handwriting expert to examine the July 2015 outcry letter. After a pretrial hearing held on August 4, 2017, Wilson filed three motions for continuance of the August 22, 2017 trial setting. His initial motion for a continuance was denied on August 14. Nevertheless, on August 18, Wilson amended and refiled his motion for a continuance. On the morning of August 21, the day before trial, he amended the motion for a continuance a second time, this time alleging for the first time that a continuance was warranted in part because it was not "until the pretrial conference on the 4th of August, 2017, [that] Andrew Wilson raised new issues that had not been apparent before because the Defense has abided by the protective order in not providing a copy of documents in this case to the Defendant or anyone else not permitted." The second amended motion alleged that the defense needed additional time to have an evaluation done in this case related to a sealed motion filed August 21, 2017.[6] The trial court denied the request for a continuance that morning but also signed an ex parte order requiring the State to provide writing samples of Amy, Judith, and Katherine.

---

[6]Although several sealed motions are part of the record before us, there is no sealed motion dated August 21, 2017.

9

The next morning, before trial began, Wilson's counsel reurged her request for a continuance and explained that although the State provided writing samples for Judith and Amy,[7] the handwriting expert needed more time and additional writing samples in order to complete the analysis. The trial court denied the request again.

In his motion for new trial filed September 22, 2017, Wilson's counsel claimed for the first time that Wilson did not voice his concern that the outcry letter was not written by Amy until one week before trial. Wilson argues this on appeal as well.

We review the trial court's decision to deny the request for a continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007), *cert. denied*, 553 U.S. 1080 (2008). In order to show reversible error predicated on the denial of a pretrial motion for continuance, a defendant must demonstrate both that the trial court erred in denying the motion and that the lack of a continuance harmed him. *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010).

We do not view the trial court's decision to deny the motion for continuance as error. Wilson viewed the note at the pretrial hearing on August 4 but, according to his motion for new trial, waited until a week before trial to voice his concern about the handwriting to his attorney. Wilson did not explain to the trial court and does not explain to this court why he waited until the morning before the trial setting to seek expert analysis of the handwriting samples. In fact, Wilson attached an August 22

_____

[7]Wilson's counsel did not mention or complain about the lack of a writing sample from Katherine.

10

letter to his motion for new trial written by the handwriting expert and stating that the estimated timeframe necessary to prepare a report was seven days.

Addressing similar facts, the court of criminal appeals has held that waiting until the first day of trial to request expert assistance did not warrant a continuance. *Id.*; *Wright v. State*, 28 S.W.3d 526, 533 (Tex. Crim. App. 2000) (rejecting appellant's claim of prejudice by denial of continuance and noting, "[e]ven if [he] could point to specific prejudice under this point of error, he would not now be allowed to profit from his own failure to act"), *cert. denied*, 531 U.S. 1128 (2001). It based its opinions in part on the recognition that a motion for continuance for the purpose of seeking expert assistance is "*particularly* within the discretion of the trial court." *Gonzales*, 304 S.W.3d at 844 (quoting George E. Dix & Robert O. Dawson, 42 Tex. Prac.: Crim. Prac. & Proc. § 28.56 (2d ed. 2001) at 533). As in *Wright*, under these facts we cannot lay the blame at the trial court's feet when Wilson's inability to obtain a report was a result of his failure to act on his concern in a timely manner.

Because Wilson does not explain on appeal and did not explain to the trial court below why he waited until the eve of trial to seek the assistance of a handwriting expert and the handwriting samples from Judith and Amy, we are unable to say that the trial court abused its discretion by denying his motion for continuance. Accordingly, we overrule Wilson's first issue.

## II. Extraneous-offense testimony by Beth and Hank

In his second issue, Wilson argues that the trial court abused its discretion by admitting Beth's and Hank's testimony about extraneous offenses.

Article 38.37 statutorily expands the admissibility of extraneous-offense evidence in a trial involving certain offenses against children, including aggravated sexual assault. Tex. Code Crim. Proc. Ann. art. 38.37, § 1(a)(1)(A), (B) (West 2018). Section 1(b) of the article applies to evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense. *Id.* § 1(b). Section 2, on the other hand, is not limited to evidence of offenses committed against the child who is the victim in the immediate prosecution:

> Notwithstanding Rule 404 and Rule 405, Texas Rules of Evidence, and subject to Section 2-a, evidence that the defendant has committed a separate offense described by Subsection (a)(1) or (2)[8] may be admitted . . . for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant.
>
> Sec. 2-a. Before evidence described by Section 2 may be introduced, the trial judge must:
>
> (1) determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt; and
>
> (2) conduct a hearing out of the presence of the jury for that purpose.

*Id.* §§ 2(b), 2-a.

---

[8]Subsection (a)(1) and (2) include sexual offenses, assaultive offenses, and prohibited sexual conduct committed against a child under 17 years of age. *Id.*

We review the trial court's admission of evidence for an abuse of the broad discretion afforded to the trial court's decisions to admit or exclude evidence. *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (op. on reh'g); *Ryder v. State*, 514 S.W.3d 391, 399 (Tex. App.—Amarillo 2017, pet. ref'd). If the trial court's decision falls outside the "zone of reasonable disagreement," it has abused its discretion. *Montgomery*, 810 S.W.2d at 391.

Wilson argues that the trial court could not have found beyond a reasonable doubt, as required by section 2-a(1), that Wilson committed the sexual abuse alleged by Beth. In support of his argument, Wilson points to Detective Perry's conclusion that Beth was not truthful and his decision not to pursue criminal charges against Wilson.

Beth testified at a pretrial hearing that when she was around ten or eleven years old and living in a trailer park, Wilson would sometimes stay at her trailer when her parents were working late. She also testified that Wilson sometimes took her to Lake Nocona. Beth testified that in late 2005 or early 2006, she went to Lake Nocona with Wilson, her two siblings, and Amy. She testified that she tried to sleep in the car instead of the tent because she was afraid of bugs. According to Beth, Wilson provided her with alcohol at the time, and when Beth decided to sleep in the car instead of in the tent with everybody else, Wilson told her to stay awake so he could talk to her. Beth recalled that when Wilson got into the car, he forced her to have sex. Beth testified that Wilson had sex with her at least eight times, sometimes in her

13

bedroom in her family's trailer and sometimes in an abandoned house. At one point in 2006, Beth thought she might be pregnant. Beth remembered when her dad, Hank, confronted Wilson, and Beth testified that Wilson admitted to Hank that he had had sex with Beth. Hank also recounted the confrontation in his testimony at the pretrial hearing. Hank testified that on July 11, 2006, he confronted Wilson about a rumor he heard about Beth, who was 11 at the time, being pregnant. According to Hank, Wilson initially denied having sex with Beth, but after Hank pressed him further, Amy "spoke up and said [Beth]'s pregnant with my daddy's child." Hank testified, "And I asked him again, I said, Andy, did you? He bowed his head and looked at me and said, yes, sir, I have, and we think she might be pregnant."

The trial court also admitted documentation from CPS indicating that in 2006 CPS had found reason to believe that Wilson sexually abused Beth and Detective Perry's police report in which he concluded that Beth was not being truthful and closed the investigation. Detective Perry did not testify at the pretrial hearing. The trial court found that the evidence of Wilson's abuse of Beth was admissible and agreed to include a limiting instruction in the jury charge.

Beth's and Hank's testimony was adequate to support a finding by the jury beyond a reasonable doubt that Wilson sexually abused Beth. Aggravated sexual assault is shown where there is evidence that the accused intentionally and knowingly caused the sexual organ of a child under 14 to contact the sexual organ of another person, or intentionally and knowingly caused the penetration of a child's sexual organ

14

by any means. Tex. Penal Code Ann. § 22.021(a)(1)(B)(iii), (2)(B). A complainant's testimony may be sufficient evidence to convict a defendant. Tex. Code Crim. Proc. Ann. art. 38.07 (West Supp. 2018). And it is well established that the uncorroborated testimony of a child victim alone can be sufficient to support a conviction of aggravated sexual assault of a child. *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978).

Beth testified to Wilson's sexual abuse of her when she was ten or eleven years old, and Hank provided corroborating testimony that Wilson admitted that he had sex with Beth. It was within the jury's role as the trier of fact to evaluate their credibility in light of Detective Perry's investigation and conclusions; the trial court's decision to allow the evidence was therefore within the zone of reasonable disagreement. *See id.*

To the extent that Wilson argues on appeal that the risk of unfair prejudice presented by admitting Beth's and Hank's testimony outweighed any probative value it carried, *see* Tex. R. Evid. 403, Wilson did not preserve any such objection, *see* Tex. R. App. P. 33.1(a)(1). Wilson broadly objected to the State's notice of extraneous-offense evidence by filing a request for a pretrial hearing in which he broadly referred to rule 403. But Wilson did not at any point during the pretrial hearing, nor at trial, lodge a rule 403 objection or secure a ruling on such an objection. By failing to do so, he has forfeited this complaint on appeal. *See id.* (requiring a party to present a timely objection stating the specific grounds for the desired ruling), 33.1(a)(2) (requiring that the trial court rule on the objection).

We therefore overrule Wilson's second issue.

## III. Voir dire questioning

In his third issue, Wilson argues that the trial court violated his right to an impartial jury trial by restricting his questioning of the jury panel.

During voir dire, Wilson's counsel began to explain how the law had changed to allow evidence of some extraneous offenses. She was interrupted when the prosecutor asked for a bench conference, which was then held off the record, and when they returned to the record, Wilson's counsel moved on to another topic. Later, when the trial court and the attorneys were discussing their intended strikes, Wilson's counsel asked to put the following on the record:

[Wilson's counsel]: I'd like to put something on the record before we do challenges for cause.

[Trial court]: What is that?

[Wilson's counsel]: Our conference on the bench about my question on burden of proof in regards to 38.27[9] was not on the record is my understanding. And so I think it's important to note that you sustained the State's objection before I even got my question out, which his objection was to a question that was not actually my question. My question was on - -

[Trial court]: Objection sustained. I sustain. She's correct.

---

[9]Although counsel referred to article 38.27, based on the surrounding context, we assume she intended to refer to article 38.37 regarding extraneous offenses. *Compare* Tex. Code Crim. Proc. Ann. art. 38.27 (West 2018) (addressing evidence of handwriting) *with id.* art. 38.37.

[Wilson's counsel]: And my question was on - - my question was on specifically the burden of proof, so I'm going to ask if I can make a proffer of evidence of what my question would have been.

[Trial court]: You can read your question into the record.

[Wilson's counsel]: Sure. My question would have been: Who would have - - who would not require the State to prove beyond a reasonable doubt that at the time the offense was alleged to have occurred, the victim was under 14 years of age if evidence of an unrelated sexual offense is proven beyond a reasonable doubt?

And according to case law, that's not - -

[Trial court]: I don't want to argue about it. It's overruled. She's not going to get to ask it.

Later, Wilson's counsel repeated her request: "I just would request to have additional time to ask that one question that I put on the [record] about burden of proof on 38.[3]7 evidence." The trial court denied her request.

We review the trial court's limitation of the voir dire process for an abuse of the trial court's broad discretion to impose reasonable restrictions on the voir dire process. *Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012), *cert. denied*, 571 U.S. 1109 (2013). Where the trial court placed no absolute limitation on the substance of a defendant's voir dire question, but merely limited a question due to its form, defense counsel must rephrase the question or risk waiving the voir dire restriction. *Id.* (citing *Howard v. State*, 941 S.W.2d 102, 108 (Tex. Crim. App. 1996), *cert. denied*, 535 U.S. 1065 (2002), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535, 538 (Tex. Crim. App. 2014)). Additionally, control of the voir dire proceedings is well within the trial court's discretion. *See Ratliff v. State*, 690 S.W.2d 597, 599-601

17

(Tex. Crim. App. 1985) (discussing the trial court's ability to control and limit the length of voir dire proceedings).

Wilson has failed to preserve any error that took place in the off-the-record conference during voir dire. Preservation requires a party to present to the trial court a timely request that states the specific grounds for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015), *cert. denied*, 136 S. Ct. 1461 (2016). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013). Because the conference was held off the record, we do not know the substance of any objection or ruling that was made during the conference. Wilson's counsel's later attempt at a clarification does not remedy this failure to preserve any error. Without any indication that the trial court imposed an absolute limitation on the underlying substance of Wilson's voir dire question, Wilson has failed to preserve any error that took place during the off-the-record conference. *Howard*, 941 S.W.2d at 108.

The question remains whether the trial court reversibly erred by refusing to allow Wilson's counsel to ask the venire panel an additional question after the panel had been retired to the jury room and the State had started making its challenges for cause.

18

The trial court has broad discretion in the manner it chooses to conduct voir dire, "both as to the topics that will be addressed, and the form and substance of the questions that will be employed to address them." *Jacobs v. State*, No. PD-1411-16, 2018 WL 4905292, at *4 (Tex. Crim. App. Oct. 10, 2018) (citation omitted). Limitations on this broad discretion are "notably rare" and include topics such as racial prejudice, widespread and provocative pretrial publicity, and certain topics applicable in capital-punishment cases. *Id.* The court of criminal appeals recently adopted the approach of the United States Supreme Court that, "[t]o be constitutionally compelled, . . . it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Id.* at *5 (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 425–26, 111 S. Ct. 1899, 1905 (1991)).

Even if we were to agree with Wilson and assume that Wilson's requested question was a proper question and fell into such "notably rare" areas that its preclusion by the trial court violated his constitutional right to an impartial jury, we disagree with Wilson's assertion that such error rose to the level of reversible error. *Jacobs* clarified that if a voir dire limitation violates a constitutional right, the reviewing court should apply the constitutional-error harm analysis of rule 44.2(a). *Id.* at *3; *see also* Tex. R. App. P. 44.2(a). In so doing, the question is whether the trial court's refusal to allow Wilson to ask the venire panel if it would require the State to prove that Amy was under the age of 14 at the time of the charged offense if the State

19

proved the elements of an uncharged, extraneous offense beyond a reasonable doubt was harmless beyond a reasonable doubt. *See Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). We "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment,'" and if applicable, we may consider the nature of the error, the extent that it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on the error. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)). This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not "in the light most favorable to the prosecution." *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989), *disagreed with in part on other grounds by Snowden*, 353 S.W.3d at 821–22.

A review of the record in this case weighs against finding harm. As we interpret it, the question sought by Wilson's counsel asked if any veniremember would not require the State to prove the age element of the charged offense if the evidence of an unrelated offense was proven beyond a reasonable doubt. The venire panel was questioned at length by both parties about the State's burden of proof. The State also explained the elements of aggravated sexual assault of a child under the age of 14 and informed the jury that it had the burden to prove "each and every one" of those elements.

During the trial, Amy's age at the time of the offense—the focus of the requested question—was not disputed; she was only 14 at the time of trial. And finally, the jury charge included an express instruction that the jury could not consider evidence of extraneous offenses unless it found and believed "beyond a reasonable doubt that the Defendant committed such other conduct, if any such conduct occurred." Without evidence otherwise, we generally presume that the jury followed the instructions it was given. *See Kirk v. State*, 199 S.W.3d 467, 479 (Tex. App.—Fort Worth 2006, pet. ref'd).

After carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we hold beyond a reasonable doubt that any error by the trial court in refusing to ask the additional question of the venire panel did not contribute to appellant's conviction or punishment. *See* Tex. R. App. P. 44.2(a). We therefore overrule Wilson's third issue.

## IV. The written outcry statement

In his fourth issue, Wilson argues that the trial court erred by admitting the written outcry letter. We will review the trial court's decision to admit the letter for an abuse of discretion and will reverse the trial court's ruling only if it was outside the zone of reasonable disagreement. *Martinez v. State*, 178 S.W.3d 806, 810 (Tex. Crim. App. 2005) ("Article 38.072 is a rule of admissibility of hearsay evidence.").

Article 38.072 allows for the admission of an outcry statement by a child in the prosecution of certain offenses, including sexual offenses committed against children. Tex. Code Crim. Proc. Ann. art. 38.072 (West Supp. 2018). As it relates to this case, the article applies only to statements by the complainant child that describe the alleged offense and that were made to the first person over the age of 18, other than the defendant. *Id.* § 2(a). The party intending to use the statement at trial must provide notice and a "written summary of the statement" before trial, the trial court must find that "the statement is reliable based on the time, content, and circumstances of the statement," and the child must be available to testify in court. *Id.* § 2(b).

The issue of the outcry statement was addressed at the August 4 pretrial hearing. Judith testified to her discovery of the note, her discussion with Amy that it was a serious accusation, and her subsequent calls to CPS and the police. The letter was admitted into evidence without objection for purposes of the hearing. The trial court found that Judith was the proper outcry witness, to which Wilson's counsel agreed but objected to the admission of the note into evidence on the basis that it was

22

hearsay. The trial court disagreed and stated that it would admit the written outcry statement. When the State offered the written outcry statement at trial during Judith's testimony, Wilson's counsel objected on the basis of hearsay because "[i]t wasn't written by the party testifying at the time." The trial court overruled the objection. The State discussed the letter with Judith and—without any objection by Wilson's counsel—Judith read the contents of the letter to the jury.

In arguing that the written outcry was inadmissible, Wilson relies upon *Bays v. State*, in which the court of criminal appeals held that article 38.072 does not permit the admission of video-recorded statements of a complainant. 396 S.W.3d 580, 592 (Tex. Crim. App. 2013). In *Bays*, a 30-minute video recording of a forensic interview of the complainant child was the only evidence admitted at trial of the child's outcry statements. *Id.* at 583. The court of criminal appeals found that article 38.072 was ambiguous as to the format of the outcry statement that was permitted under the statute but consulted legislative history and considered another statute that expressly addressed the admission of videotaped statements by children in certain criminal prosecutions. *Id.* at 586–92; *see also* Tex. Code Crim. Proc. Ann. art. 38.071 (West Supp. 2018). Wilson argues that we should extend the reasoning of *Bays* to preclude the admission of written outcry statements such as the one at issue here.

But even if we did and held that the trial court abused its discretion, any such error would not rise to the level of reversible error. Error in the admission of evidence is generally considered to be nonconstitutional. *See Solomon v. State*, 49

23

S.W.3d 356, 365 (Tex. Crim. App. 2001); *see also Walters v. State*, 247 S.W.3d 204, 222 (Tex. Crim. App. 2007) (determining that exclusion of evidence supporting defendant's defensive theory was nonconstitutional error). To evaluate nonconstitutional error, we apply rule 44.2(b) and disregard the error if it did not affect appellant's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010) (citing *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)), *cert. denied*, 562 U.S. 1142 (2011); *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004). Unlike the situation in *Bays*, the written outcry statement was not the only evidence admitted of Amy's outcry.[10] Wilson agreed that Judith was the proper outcry witness—his counsel told the trial court at the pretrial hearing, "So [Judith] getting on the stand and saying this is what I was told, absolutely admissible." Judith testified

---

[10]We also note that the admission of the videotaped statement in *Bays* violated article 38.071, which requires—among other things—that the child be unavailable to testify before the video can be admitted into evidence. *See Bays*, 396 S.W.3d at 589–90 (discussing the requirements of article 38.071 and explaining that allowing video statements under article 38.072 would create a "loophole" to avoid the stricter requirements of article 38.071). There is no similar statute addressing the admission of written statements.

without objection to her discovery of the letter and the contents of the letter and she read the letter verbatim to the jury. Amy testified without objection that she wrote the letter to tell Judith that Wilson raped her. Amy also described the abuse for the jury, and Henley recounted Amy's description of the abuse given as part of the SANE examination.

Based upon the record before us, we cannot say that any error in the admission of the written outcry statement affected Wilson's substantial rights because Judith testified without objection to the contents of the letter. We therefore overrule his fourth issue.

## V. *Allen* charge

In his fifth and final issue, Wilson argues that the trial court reversibly erred when it gave an *Allen* charge that, in Wilson's estimation, caused jury misconduct.

The case was submitted to the jury at approximately 11:00 a.m. on the third day of trial. After about an hour, the jury sent out a note that read: "4 NOT Guilty 8 Guilty We are stuck!" After the jury took an hour-long break for lunch, the trial court sent a note back that said, "Members of the Jury: Please continue with your deliberations." At approximately 2:25 p.m., the jury sent out another note indicating they were still hung and which stated:

At present, the jury is voting at:

3 Not guilty

9 Guilty

This is firm, we do not see further progress with this jury.

We are taking a break until 3:15 p.m.

The trial court informed counsel for both parties that it had prepared an *Allen* charge in response. Wilson's counsel objected to the issuance of an *Allen* charge on the basis that the trial court had already asked the jury to continue deliberating in its response to the first jury note. The trial court overruled the objection and read the following to the jury:

MEMBERS OF THE JURY:

The Court further charges you as follows:

If the Jury finds itself unable to arrive at a unanimous verdict, it would be necessary for the Court to declare a mistrial and discharge the Jury.

The indictment will still be pending, and it is reasonable to assume that the case will be tried again before another Jury at some future time. Any such future Jury will be impaneled in the same way this Jury has been impaneled, and will likely hear the same evidence which has been presented to this Jury.

The questions to be determined by that Jury will be the same questions confronting you and there is no reason to hope that the next Jury will find these questions any easier to decide than you have found them.

With this additional instruction, you are instructed to continue deliberations in an effort to arrive at a verdict that is acceptable to all members of the Jury, if you can do so without violation to your conscience.

The record reflects that the jury then returned to deliberations at 3:07 p.m. A final jury note was file-stamped at 3:25 p.m. and read: "We the jury find the defendant

26

guilty by unanimous vote." At 3:30 p.m., the jury returned to the courtroom and the guilty verdict was read. The jury was polled and each juror confirmed that the guilty verdict correctly reflected his or her vote.

An *Allen* charge is a supplemental charge that is sometimes given to a jury that has signaled that it is deadlocked. *Allen v. United States*, 164 U.S. 492, 501, 17 S. Ct. 154, 157 (1896). The purpose of the *Allen* charge is to remind the jury that if it is not able to reach a verdict, a mistrial will result, the case will remain pending, and there is no guarantee that a second jury will find the issue any easier to resolve. *See Barnett v. State*, 189 S.W.3d 272, 277 n.13 (Tex. Crim. App. 2006). Though permissible, trial courts must be careful to word and administer an *Allen* charge in a noncoercive manner. *Id.*; *see also Lowenfield v. Phelps*, 484 U.S. 231, 237, 108 S. Ct. 546, 550 (1988) (explaining that the primary inquiry in determining the propriety of an *Allen* charge is its coercive effect on juror deliberation, "in its context and under all circumstances," (quoting *Jenkins v. United States*, 380 U.S. 445, 446, 85 S. Ct. 1059, 1060 (1965))).

In considering the potential coercive effects of an *Allen* charge, courts must be mindful of one of the core principles of our jury system—the expectation of and respect for differing views:

> The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his

27

opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself.

*Howard*, 941 S.W.2d at 123–24. Thus, a jury charge may be considered coercive if it suggests to jurors in the minority view that they should defer to the majority view. But when an *Allen* charge suggests that *all* jurors reevaluate their opinions in the face of disparate viewpoints, it cannot be said to be coercive on its face. *Id.*

Here, the *Allen* charge was not directed to particular jurors, but to the entire jury, and did not require a specific result: "[Y]ou are instructed to continue deliberations in an effort to arrive at a verdict that is acceptable to all members of the Jury, if you can do so without violation to your conscience." Because the *Allen* charge given here was not addressed specifically to the jurors in the minority view, it cannot be said that it was coercive on its face. Similar instructions have been held to be permissible and not coercive. *See Arrevalo v. State*, 489 S.W.2d 569, 571–72 (Tex. Crim. App. 1973) (holding that the instruction, "you are instructed to continue deliberations in an effort to arrive at a verdict which is acceptable to all members of the jury," was permissible); *Draper v. State*, 335 S.W.3d 412, 417 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). In all other respects, the charge met the intended purpose of the *Allen* charge. It explained the consequences of jury deadlock—that the case would be declared a mistrial, the indictment would remain pending, and the case could be reasonably assumed to be tried again before another jury to likely hear the same evidence and determine the same questions. *See Barnett*, 189 S.W.3d at 277 n.13.

28

In support of his argument that the *Allen* charge was improper, Wilson relies upon an affidavit by a juror that was attached to his motion for new trial that indicated that the juror felt coerced into voting "guilty" by the *Allen* charge given:

> [I]t is my belief that Mr. Wilson was innocent in that case that was not my verdict [sic] because of various reasons. . . . Reason #2 the Judge had told us jurors that we needed to keep trying to reach a unanimous decision which was very difficult on my part. The Judge admonished us one [sic] in writing to keep deliberating and after we still send out a note that we couldn't reach a decision in the case because it would be tried again and we had all of the evidence in the case. I felt like the Judge was ordering us to make a decision and we voted guilty.

Texas rule of evidence 606(b) prohibits the consideration of testimony by a juror during an inquiry into the validity of a verdict unless one of two exceptions applies: (1) if the juror's testimony relates to an outside influence that was improperly brought to bear on any juror, or (2) to rebut a claim that the juror was not qualified to serve. Tex. R. Evid. 606(b). Because it did not fit either exception, this juror's affidavit cannot be considered by the trial court or by this court on appeal. *See Franks v. State*, 90 S.W.3d 771, 800–01 (Tex. App.—Fort Worth 2002, no pet.) (holding that the effect of an *Allen* charge on jury deliberations is not an outside influence and that rule 606(b) foreclosed a juror's ability to provide evidence on the impact of the trial court's *Allen* charge). Without this affidavit, we find no support on these facts or in this record for holding that the *Allen* charge given by the trial court was impermissibly coercive.

Accordingly, we overrule Wilson's fifth issue.

29

## Conclusion

Having overruled each of Wilson's five issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 29, 2018